ORIGINAL

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>An iPhone, bearing serial number DX3TH0DYHTVQ<br>(IMEI 355799077690988) | )<br>)<br>)<br>)<br>)<br>) |

Case No.    2:17-MJ-2626

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to *Duty Magistrate Judge* .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  *10/23/17   12:10 PM*

City and state:  *Los Angeles, CA*

*Steve Kim*
*Judge's signature*

*Steve Kim*
*US Magistrate Judge*
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>2:17-MJ-2626 | Date and time warrant executed:<br>10-27-17 | 3:00 p.m | Copy of warrant and inventory left with: |
| Inventory made in the presence of :<br>HSI JUAN MUNOZ | | |
| Inventory of the property taken and name of any person(s) seized: | | |

CALL LOG, TEXT, APP MESSAGES, PHOTOS, VIDEOS

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  10-27-17

_____
*Executing officer's signature*

MARLON CORONADO, TASK FORCE OFFICER
*Printed name and title*

## ATTACHMENT A

### DEVICES TO BE SEARCHED

The following digital device (the "PHONE"), seized from DAVID ARRIETA at the Los Angeles International Airport on or about October 12, 2017, currently in the possession of the U.S. Drug Enforcement Agency in Los Angeles, California:

       a.   An iPhone, bearing serial number DX3TH0DYHTVQ (IMEI 355799077690988).

Instrumentality Protocol

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1.    The fruits, instrumentalities, and evidence of
violations of 21 U.S.C. § 846 (conspiracy to distribute
controlled substances), 21 U.S.C. §§ 841(a)(1), (b)(1)(A)
(distribution and possession of controlled substances), and 21
U.S.C. § 843(b) (unlawful use of a communication facility to
facilitate the distribution of a controlled substance)
(collectively, the "OFFENSES"), namely:

a.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

b.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

ii

Instrumentality Protocol

        d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

        e.    Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs or firearms and the collection or transfer of the proceeds of the above-described OFFENSES;

        f.    Contents of any calendar or date book; and

        g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

        h.    Any device used to facilitate the above-listed violations (and forensic copies thereof).

        i.    With respect to any device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.    evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device; and

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

2. In searching the PHONE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may

search any device capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each device where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the devices as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without first obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

e.    The search team may subject all of the data contained in each device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

f.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

v

Instrumentality Protocol

g.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

h.   If the search team, while searching a device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

i.   If the search determines that a device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

j.   If the search determines that a device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

k.   If the search determines that the device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

l.   The government may retain a device itself until further order of the Court or one year after the conclusion of

vi

Instrumentality Protocol

the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

m.    After the completion of the search of the devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Instrumentality Protocol

## **AFFIDAVIT**

I, Marlon Coronado, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search an iPhone, bearing serial number DX3TH0DYHTVQ (IMEI 355799077690988) (the "PHONE") seized from DAVID ARRIETA ("ARRIETA") on or about October 12, 2017, as described more fully in Attachment A, which is incorporated by reference, for evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (distribution and possession of controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate the distribution of a controlled substance) (collectively, the "OFFENSES"), as described further in Attachment B, which is also incorporated by reference.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**Instrumentality Protocol**

1

## II. **BACKGROUND OF TFO MARLON CORONADO**

3.    I have been a Los Angeles Airport Police Department Officer since June 2004.  I have been assigned to Drug Enforcement Administration ("DEA") as a sworn Task Force Officer ("TFO") since July 2015.  I am currently assigned to the DEA Los Angeles Field Division, Los Angeles International Airport Narcotics Task Force ("LAX Task Force"), as well as the Los Angeles Interagency Metropolitan Apprehension Crime Task Force.

4.    The LAX Task Force is an interagency task force based at the Los Angeles International Airport ("LAX").  In addition to the DEA, the LAX Task Force consists of the following agencies: the Los Angeles World Airports Police Department, the Los Angeles Police Department ("LAPD"), and the Los Angeles County Sheriff's Department ("LASD").  The LAX Task Force also works closely with the United States Customs and Border Protection ("CBP"), the Transportation Security Administration ("TSA"), the Department of Homeland Security ("DHS") and the Federal Bureau of Investigation ("FBI").  All of the aforementioned agencies recognize the need for a coordinated law enforcement effort to target airport/airline internal criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States, and throughout the world.

5.    Specifically, the LAX Task Force is focused on investigating airport/airline internal conspiracies in which criminal enterprises recruit airport/airline employees to exploit their privileged airport access and knowledge of

**Instrumentality Protocol**

2

existing airport security procedures, as well as airline passengers smuggling drugs and drug proceeds through the airport. Previous and current investigations have identified Transnational Criminal Organizations that rely generally on drug trafficking as their primary source of revenue. As such, Transnational Criminal Organizations require the use of various forms of transport in order to obtain and distribute large amounts of illicit drugs into and through the United States, and air travel provides a significant opportunity for them to do so. Additionally, air travel provides an opportunity to smuggle and distribute other contraband, including drug proceeds.

6. During my career, I have participated in a variety of drug investigations ranging from simple possession to complex international conspiracies. I have also participated in the execution of search warrants, conducted physical surveillances, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.

7. From June 2014 through June 2015, I was assigned to Homeland Security Investigations ("HSI") as a TFO. While assigned to HSI, I participated in several drug investigations, involving the unlawful importation, exportation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, and the conducting of monetary transactions involving the proceeds of specified unlawful activities.

**Instrumentality Protocol**

3

8.     Based on my training and experience, I am familiar
with the methods of operation of narcotics traffickers,
including the importation, exportation, distribution,
transportation, and storage of controlled substances, as well as
the collection of money proceeds of drug trafficking and methods
of money laundering used to conceal the nature of the proceeds.
I am also familiar with the methods of operation used by people
who distribute controlled substances, including the
distribution, storage and transportation of controlled
substances, as well as the collection of proceeds of drug
trafficking and methods of money laundering used to conceal the
nature of the proceeds.

### III.  SUMMARY OF PROBABLE CAUSE

9.     On or about October 12, 2017, law enforcement officers
found two packages containing a substance resembling heroin
concealed inside two bags checked in ARRIETA's name.  At the
time, ARRIETA was about to board a Southwest Airlines flight
from LAX to Las Vegas.  In a Mirandized interview, ARRIETA
admitted to being a paid drug courier.

10.    The two packages containing the suspected heroin
weighed approximately 4.76 kilograms.  A laboratory analysis has
confirmed that one of the packages contained approximately 1,484
grams of a mixture or substance containing heroin.  The other
package is still being tested.

11.    When he was arrested at LAX, ARRIETA possessed the
PHONE on his person.  After he consented to a search of the
PHONE, a preliminary review of the PHONE's contents revealed

**Instrumentality Protocol**

4

communications with individuals in Connecticut, Ohio, and
Kentucky regarding the distribution of controlled substances.

### IV. **STATEMENT OF PROBABLE CAUSE**

12.    Based on my review of law enforcement reports, as well
as my own observations and knowledge of the investigation, I am
aware of the following:

#### A.    **The Discovery of the Heroin**

13.    On or about October 12, 2017, at approximately 7:00
a.m., DEA Special Agent ("SA") Norm Tobias and I responded to
the DEA LAX Office where we met with LAX Task Force Detectives
Claudio Cruz, Eric Hakala, and Richard Doray, and LAX Police
Officers Haro, Juliano, and Farias.

14.    Officer Haro informed me that, at approximately 4:50
a.m., he and Officers Juliano and Farias received a radio call
to respond to an investigation at the TSA oversize baggage room
in LAX Terminal 1.  Upon arrival, Officer Farias spoke with TSA
Officer Mason Adler.  TSA Officer Adler's assignment was to
conduct security checks and searches on outbound checked
luggage.

15.    TSA Officer Adler said that he was conducting security
checks on passenger-checked luggage via the x-ray monitor screen
when he saw an unknown image at the bottom of a large bag.
Based on his training and experience, the bag's stitching
appeared to be altered or tampered.  TSA Officer Adler showed
the image to his supervisor, Amilkar Socorro, who in turn
requested that a TSA Bomb Detection Officer inspect the bag.

**Instrumentality Protocol**

16. Bomb Detection Officer Joshua Yamasaki arrived and conducted a manual security check of the bag's contents. Officer Yamasaki discovered that the bag contained a false compartment and noticed that the stitching was not original. Officer Yamasaki removed the stitching from the false compartment and discovered a package that resembled a flattened pillow, wrapped with black electrical tape, concealed inside the inner layer of the luggage. Officer Yamasaki determined that the package inside the bag was not an explosive.

17. Officer Yamasaki then used a box cutter to make an incision to further investigate the package's contents. He saw what resembled a brown tar substance inside the package.

18. The bag containing the package had a baggage tag with ARRIETA's name. TSA Supervisor Socorro discovered that ARRIETA had checked in a second bag. Socorro located the second bag and re-ran it thru the x-ray machine. The x-ray machine did not show any abnormalities on ARRIETA'S second bag.

19. Officers Haro and Juliano saw the dark tar substance with a vinegar-like odor emitting from the package in the first bag. Based on their training and experience, Officers Haro and Juliano believed it was heroin.

20. A TSA database check revealed that ARRIETA would be flying aboard Southwest Airlines Flight 1031 from LAX to Las Vegas, Nevada and then continuing from Las Vegas to Columbus, Ohio on Southwest Airlines Flight 4246. Flight 1031 was due to depart LAX at 7:00 a.m. on October 12, 2017 from Gate 15.

**Instrumentality Protocol**

6

21.   Los Angeles World Airports Police Department Officer
Luis Perez spoke with a Southwest Airlines representative who
told him that the flight was ready to depart.   Southwest
Airlines paged ARRIETA to the ticket counter at Gate 15 and
ARRIETA voluntarily walked over.

22.   Detective Cruz asked ARRIETA for identification, and
ARRIETA provided a California identification card.   Detective
Cruz verified the information and returned it to ARRIETA.
Detective Cruz asked ARRIETA if he had any checked luggage.
ARRIETA said, "Yes, I checked one suitcase."   Detective Cruz
asked ARRIETA if he had any additional checked bags or carry-on
bags.   ARRIETA then said that he had checked two bags.

23.   ARRIETA was asked to voluntarily accompany the
officers to the LAX Task Force office to verify the contents
inside his bags.

**B.   ARRIETA's Second Piece of Luggage**

24.   At the LAX Task Force office, LAPD Canine Officer
Suviate had her dog "Smithy" conduct a sniff of ARRIETA's
luggage.   Smithy positively alerted to the presence of narcotics
in both bags.

25.   Detectives Doray and Cruz obtained verbal and written
consent from ARRIETA to search his second piece of luggage.
They discovered that it also contained a false compartment and
that the stitching was not original.   Detective Doray removed
the stitching from the false compartment and discovered another
package that resembled a flattened pillow, wrapped with black
electrical tape, concealed inside the inner layer of the

**Instrumentality Protocol**

7

luggage.  A TSA agent cut open the package, and SA Tobias and I saw the black tar substance and smelled the strong smell of vinegar emitting from the package.  In my training and experience, the odor I smelled is associated with heroin.

### C.    **ARRIETA's Statements**

26.   I witnessed SA Tobias reading ARRIETA his <u>Miranda</u> rights, and ARRIETA agreed to provide a statement.  ARRIETA told us the following:

a.    About a year ago, ARRIETA met Oscar Sanchez and Rodolfo Munoz through a mutual friend.  In or around April 2017, Sanchez and Munoz offered him a job transporting drugs in checked luggage to the East Coast.  ARRIETA agreed to their job offer because he needed money.

b.    Sanchez and Munoz paid $1,500 in cash to ARRIETA for each bag that ARRIETA transported with drugs from Los Angeles to cities on the East Coast.  ARRIETA knew that he was transporting drugs but he thought that he was transporting cocaine.

c.    Sanchez or Munoz would meet with ARRIETA a day before his flight to give him the cash to purchase the airline ticket along with the bag(s) with the drugs.  ARRIETA would deposit the cash into his GreenDot Visa card and purchase his airline ticket through Expedia or Cheap Tickets.  Sanchez and Munoz would also give him an additional $300 in cash as spending money.

d.    Sanchez and Munoz would instruct ARRIETA on what to do with the drugs once he landed at his final destination.

**Instrumentality Protocol**

8

Sanchez and/or Munoz would message him via Facebook with a contact phone number or location to drop off the drugs. On several occasions, Sanchez and Munoz coached ARRIETA on what to tell law enforcement in the event that he were arrested, and they threatened him in the event he ever "snitched."

e.   On October 10, 2017, Sanchez went to ARRIETA's residence to drop off the money for ARRIETA to purchase a ticket for a flight to Columbus, Ohio. On October 11, 2017, Sanchez dropped off the two bags containing the drugs at ARRIETA's residence. ARRIETA called "Cookie" to give him a ride from his residence to LAX. Munoz and Sanchez had recommended that "Cookie" give him a ride to the airport. Sanchez or "Cookie" would normally pick him up and drop him off at the airport when he was transporting drugs.

f.   "Cookie" picked ARRIETA up at his residence on October 12 at 3:30 a.m. and dropped him off at LAX Terminal 1. ARRIETA then walked up to the Southwest ticket counter and checked in both of the bags containing the drugs. ARRIETA attempted to board his flight but was denied entry by the flight representative. ARRIETA was walking to the Southwest ticket counter when he was approached by law enforcement officers.

**D.   The Testing of the Heroin**

27.   DEA personnel did not conduct a presumptive field test of the black tar substance found on or about October 12, 2017. The decision not to conduct such a test was due to the significant threat to law enforcement personnel, first responders, and members of the public by fentanyl, fentanyl-

**Instrumentality Protocol**

9

related substances, synthetic opioids, and other powders that may be composed in full, or in part, of one of these aforementioned substances. Only trained personnel, in a lab or comparable secure environment, with necessary personal protective equipment, should be conducting such tests, and they should be conducted in a controlled, safe environment. Conducting tests in an uncontrolled environment, and without proper protective equipment, poses an undue risk and could result in serious bodily injury or death to those unknowingly exposed to fentanyl, fentanyl-related substances, or synthetic opioids.

28. The two packages containing the suspected heroin had a gross weight of approximately 4.76 kilograms (including the packing materials). The packages were transported to the DEA Southwest Laboratory for further testing and analysis.

29. The DEA laboratory analysis for one of the packages has been completed. The package (excluding packing materials) contained approximately 1,484 grams of a mixture or substance containing heroin. The laboratory analysis for the second package has not yet been completed.

**E. The Preliminary Search of the PHONE**

30. On or about October 12, 2017, ARRIETA provided written consent for the DEA to search the PHONE. Pursuant to ARRIETA's consent, a preliminary analysis of the PHONE identified written communications between ARRIETA and individuals in Connecticut, Ohio, and Kentucky regarding the distribution of controlled substances.

**Instrumentality Protocol**

31.  Based on my training and experience, and my review of
the communications in the PHONE, I believe that ARRIETA is not a
typical low-level drug courier.  I believe that ARRIETA is more
involved in the distribution of controlled substances than he
initially led investigators to believe.  For example,
information in the PHONE showed that ARRIETA possessed
information about the activities of other drug couriers.  Based
on my training and experience, a typical drug "mule" rarely
possesses information about the drug-trafficking activities of
other carriers.

## V.  TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

32.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
devices sometimes in fictitious and/or other individuals' names
and maintain books, receipts, notes, ledgers, bank records, and
other records relating to the manufacture, transportation,
ordering, sale and distribution of illegal drugs.  The
aforementioned records are often maintained where the drug
trafficker has ready access to them, such as on their cell
phones and other digital devices.

b.  Drug traffickers generally do not conduct
transactions for large amounts without first communicating
matters such as quantity, price, arrival time, and meet

**Instrumentality Protocol**

11

location, often through a telephone or mobile device such as the PHONE.

      c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others, often by text message, to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.    I know that it is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones utilizing digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

**Instrumentality Protocol**

12

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

33.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.   There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.   In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.   As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

**Instrumentality Protocol**

13

> c. Cell phones may contain gigabytes of storage space. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

> d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed

---

[1] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

**Instrumentality Protocol**

14

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

       e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently

**Instrumentality Protocol**

15

used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

          f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

**Instrumentality Protocol**

16

       g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    34.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

    35.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

**Instrumentality Protocol**

of the OFFENSES described above, will be found on the PHONE
described in Attachment A.

MARLON CORONADO, TFO
Drug Enforcement Agency

Subscribed to and sworn before me
this 1 day of October 2017.

HONORABLE
UNITED STATES MAGISTRATE JUDGE

**Instrumentality Protocol**